**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **STEPHANIE KEAR,** | : | |
| | : | |
| Plaintiff, | : | **CIVIL ACTION:** |
| | : | |
| v. | : | |
| | : | **COMPLAINT** |
| | : | |
| **COLLISIONRIGHT, LLC.,** | : | |
| | : | |
| Defendant. | : | **JURY TRIAL DEMANDED** |
| | : | |

**COMPLAINT**

Plaintiff Stephanie Kear, by and through her attorneys, The Lacy Employment Law Firm LLC, hereby files this Complaint against Defendant CollisionRight LLC, doing business as City Collision, and in support thereof alleges as follows:

**PROCEDURAL AND ADMINISTRATIVE REMEDIES**

1. All the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference as if set forth herein at length.

2. Venue is proper in the District Court under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred within this District.

3. On or about July 24, 2025 Plaintiff dual-filed a charge with the Pittsburgh office of the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission alleging disability discrimination and retaliation. *See Exhibit 1*, EEOC Charge No. 533-2025-02812.

4. The EEOC issued a Right to Sue letter ("Right to Sue") on February 26, 2026, and Plaintiff timely filed the above-captioned action on or before 90 days from receipt of the Right to Sue that the EEOC issued. *See Exhibit 2*.

5. Plaintiff has fully complied with all administrative prerequisites for the commencement of this action.

## PARTIES

6. Plaintiff Stephanie Kear is an individual residing at 140 Thompson Avenue, Donora, Pennsylvania 15033. At all relevant times, Plaintiff was employed by Defendant CollisionRight LLC as a Collision Estimator at its local facility operating as City Collision, located at 2950 Penn Avenue, Pittsburgh, Pennsylvania 15201.

7. Defendant CollisionRight LLC is a limited liability company with its main corporate office located at 6767 Longshore Street, 4th Floor, Dublin, Ohio 43017. Defendant operates an auto body repair business and, at all relevant times, employed 1,600 or more employees and is an "employer" within the meaning of Title VII and the PHRA.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, and Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e et seq.

9. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

10. Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occurred

in this district, including Plaintiff's employment at Defendant's Pittsburgh, Pennsylvania location and the adverse employment actions taken against her there.

11.     All conditions precedent to filing this action have been satisfied. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"), alleging pregnancy discrimination and sex discrimination. Plaintiff has received or will receive a Notice of Right to Sue and brings this action within the applicable time period.

## FACTUAL ALLEGATIONS

12.     Defendant CollisionRight LLC operates a network of auto body repair facilities throughout the United States, including a local facility in Pittsburgh, Pennsylvania operating under the name City Collision, located at 2950 Penn Avenue, Pittsburgh, Pennsylvania 15201.

13.     Plaintiff Stephanie Kear was hired by Defendant on December 2, 2024, as a Collision Estimator at the Pittsburgh location. Her starting salary was $38.00 per hour.

14.     Ms. Kear's job duties included writing repair estimates, inspecting vehicles, working with insurance representatives, providing customer service and updates on repair progress, and collaborating with repair technicians.

15.     Throughout her employment, Ms. Kear performed her job duties competently and satisfactorily. She received positive reviews on the company's internal review site, improved overall performance with direct repair contracts with insurance companies, and improved overall turnaround time with other departments.

16.     At no point during her employment did Ms. Kear receive any written warnings, disciplinary notices, or performance improvement plans.

17.     Ms. Kear was never told that her work performance was deficient in any way.

18.    During her employment, Ms. Kear became pregnant and, in early March 2025, notified Defendant of her upcoming maternity leave.

19.    On or about March 3, 2025, Ms. Kear notified Mike, the district manager and acting General Manager at the time, about her approaching birth.

20.    On or about March 6, 2025, Ms. Kear emailed HR representative Kayla Manross to request information regarding her leave.

21.    On March 17, 2025, Ms. Kear began her maternity leave due to an upcoming External Cephalic Version ("ECV") procedure related to complications from her pregnancy.

22.    On March 20, 2025, the ECV procedure was initially unsuccessful. That same day, Ms. Kear filed a short-term disability claim with The Hartford.

23.    On March 25, 2025, Kayla Manross emailed Ms. Kear asking whether she had filed a claim with The Hartford and provided information about insurance premium payment obligations for the period after Ms. Kear stopped receiving PTO payments.

24.    On March 30, 2025, a second ECV procedure was successful.

25.    On March 31, 2025, Ms. Kear gave birth to her child.

26.    On April 2, 2025, Ms. Kear submitted additional documentation to The Hartford in connection with her short-term disability claim.

27.    On April 11, 2025, Ms. Kear emailed Kayla Manross to inquire about adding her newborn to her health insurance. At that time, insurance premiums were still being paid out of her accrued PTO.

28.    On April 18, 2025, Ms. Kear received her last PTO payment.

29.    On April 23, 2025, Ms. Kear submitted additional documents to The Hartford.

30. On April 28, 2025, the new General Manager of the Pittsburgh location, Dennis, called Ms. Kear and left a voicemail introducing himself.

31. On April 30, 2025, Ms. Kear's short-term disability claim was denied by The Hartford.

32. On May 2, 2025, Kayla Manross called Ms. Kear to discuss her leave status. During that call, Ms. Kear requested a transfer to a work-from-home department within the company. Ms. Manross told Ms. Kear that a transfer was not possible at that time.

33. On May 16, 2025, Ms. Kear participated in a phone call with Kayla Manross to discuss her return to work. Ms. Kear again requested a transfer to a remote department. That request was denied a second time.

34. On May 19, 2025, Ms. Kear texted Kayla Manross a photograph of a medical note from her doctor confirming that she was physically able to return to work.

35. On May 21, 2025, Ms. Kear had a phone call with General Manager Dennis to begin planning her return to work.

36. On May 22, 2025, Ms. Kear went into the office in person to meet with General Manager Dennis and plan her return. During that meeting, the parties agreed on a return-to-work date of June 9, 2025. Ms. Kear was also informed that upon her return, she would be taking over handling of a new contract with Geico Insurance. Additionally, General Manager Dennis informed Ms. Kear that her position was transitioning from hourly to commission-based pay. Ms. Kear was told that she would be removed from her insurance if she did not return by June 16, 2025.

37. As of May 22, 2025, Defendant had accepted Ms. Kear's return-to-work plan, assigned her a future business responsibility, and set a clear return date.

38.     On May 29, 2025 — just seven days after the return-to-work meeting and eleven days before Ms. Kear's agreed-upon return date of June 9, 2025 — Ms. Kear received a phone call from Kayla Manross informing her that she was being terminated. Ms. Manross stated over the phone that corporate leadership no longer wanted to continue paying Ms. Kear's insurance premiums.

39.     Ms. Kear was given no prior warning that her employment was in jeopardy. She was not placed on a performance improvement plan, had not received any disciplinary action, and had not been told that her continued employment was conditioned on any particular course of action.

40.     After the phone call, Ms. Kear requested written confirmation of her termination. In the follow-up email she received, Defendant stated that the reason for her termination was "nonpayment of insurance premiums."

41.     Ms. Kear's insurance coverage ended on May 31, 2025.

42.     On May 19, 2025, Ms. Kear learned from a coworker that another employee at the same location, Evan Horvath, who held the same position as Ms. Kear, had also been let go around that time for a "difference of opinion" with the new General Manager. However, unlike Ms. Kear, Mr. Horvath was not on maternity leave and was not a member of a pregnancy-protected class at the time of his separation.

43.     The proffered reason for Ms. Kear's termination — nonpayment of insurance premiums — is pretextual. Ms. Kear had been actively coordinating with HR regarding her insurance premium obligations throughout her leave. At no point prior to her termination did Defendant warn her that failure to pay insurance premiums would result in the termination of her employment, as opposed to the mere termination of her insurance coverage.

44.    Ms. Kear believes that the true reason for her termination was Defendant's unwillingness to accommodate the complexities of having an employee with a new baby at home, including her delay in returning to work due to difficulties securing adequate childcare.

45.    The temporal proximity of Ms. Kear's termination to her maternity leave and childbirth, the absence of any prior disciplinary history, the pretextual nature of the stated reason, and the fact that her termination occurred just days after she had finalized return-to-work plans, all give rise to a strong inference of pregnancy discrimination.

46.    Ms. Kear had previously requested a department transfer on May 2, 2025 and again on May 16, 2025, in part to accommodate her situation as a new mother. Both requests were denied. She was terminated thirteen days after her second request.

47.    As a result of her termination, Ms. Kear suffered significant financial hardship, including the loss of a well-compensated position that offered reliable hourly pay and employer-provided benefits — compensation and benefits that are difficult to replicate in the auto body repair industry, where commission-based pay is more common and often unreliable.

48.    Ms. Kear has also suffered emotional distress as a direct result of her termination. She has been receiving treatment from her therapist, Shaun Mewes, and applied for public assistance and unemployment compensation following her termination.

**<u>COUNT ONE</u>**
**Sex Discrimination / Pregnancy Discrimination in Violation of Title VII of the Civil Rights Act of 1964, as Amended by the Pregnancy Discrimination Act of 1978 & The Pregnant Workers Fairness Act (PWFA)**

49.    Plaintiff hereby incorporates all allegations contained in the above-mentioned Paragraphs fully as if they were set forth at length.

50.    Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k), prohibits employers from discriminating

against employees on the basis of sex, including pregnancy, childbirth, and related medical conditions. Under the PDA, employers are required to treat women affected by pregnancy the same as other employees who are similar in their ability or inability to work.

51.    At all relevant times, Plaintiff was a member of a protected class as a pregnant woman and new mother.

52.    Plaintiff was qualified for her position as a Collision Estimator and performed her job duties in a satisfactory manner throughout her employment.

53.    Plaintiff suffered an adverse employment action when she was terminated on May 29, 2025.

54.    The circumstances of Plaintiff's termination give rise to an inference of discrimination, including: (a) the temporal proximity of her termination to her pregnancy and maternity leave; (b) the fact that she was terminated just eleven days before her agreed-upon return-to-work date; (c) the absence of any prior disciplinary history or performance concerns; (d) the pretextual nature of the stated reason for termination; and (e) the fact that her role was to be filled by a person outside the protected class.

55.    Defendant's stated reason for Plaintiff's termination — nonpayment of insurance premiums — is not worthy of credence. Plaintiff had been actively managing her insurance premium obligations in coordination with HR throughout her leave, and Defendant never warned her that such issues would result in termination of her employment rather than merely termination of her insurance coverage.

56.    As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer significant damages, including lost wages, lost benefits, diminished earning capacity, and emotional distress.

57.    Defendant's conduct was intentional, willful, and in reckless disregard of Plaintiff's federally protected rights, warranting an award of punitive damages.

## COUNT TWO
**Sex Discrimination / Pregnancy Discrimination in Violation of the Pennsylvania Human Relations Act**

58.    Plaintiff hereby incorporates all allegations contained in the above-mentioned Paragraphs fully as if they were set forth at length.

59.    The Pennsylvania Human Relations Act, 43 P.S. § 951 et seq., prohibits employers from discriminating against employees on the basis of sex, including pregnancy and related conditions.

60.    At all relevant times, Defendant employed five or more persons and is an "employer" within the meaning of the PHRA.

61.    At all relevant times, Plaintiff was a member of a protected class as a pregnant woman and new mother.

62.    Plaintiff was qualified for her position and performed her job duties satisfactorily throughout her employment.

63.    Plaintiff suffered an adverse employment action when she was terminated on May 29, 2025.

64.    As set forth above, the circumstances of Plaintiff's termination give rise to an inference of pregnancy discrimination under the PHRA, including the temporal proximity of the termination to her pregnancy leave, the lack of any prior disciplinary history, the pretextual nature of the stated reason, and the fact that her termination came days after she had finalized her return-to-work plan.

65.    As a direct and proximate result of Defendant's unlawful discrimination in violation of the PHRA, Plaintiff has suffered and continues to suffer significant damages, including lost wages, lost benefits, diminished earning capacity, and emotional distress.

### COUNT THREE
**Retaliation in Violation of Title VII of the Civil Rights Act of 1964, as Amended by the Pregnancy Discrimination Act of 1978 & The Pregnant Workers Fairness Act (PWFA)**

66.    Plaintiff hereby incorporates all allegations contained in the above-mentioned Paragraphs fully as if they were set forth at length.

67.    Title VII, as amended by the PDA, prohibits retaliation against employees who engage in protected activity, including requesting pregnancy-related accommodations and leave.

68.    Plaintiff engaged in protected activity by, among other things: (a) notifying Defendant of her pregnancy and upcoming maternity leave; (b) going on medically necessary maternity leave beginning March 17, 2025; (c) requesting a transfer to a work-from-home position on May 2, 2025 and again on May 16, 2025 in connection with her status as a new mother; and (d) coordinating with Defendant regarding her return to work following childbirth.

69.    Defendant was aware of Plaintiff's protected activity.

70.    Plaintiff suffered an adverse employment action when she was terminated on May 29, 2025 — thirteen days after her second request for a transfer accommodation and eleven days before her agreed return-to-work date.

71.    There is a causal connection between Plaintiff's protected activity and her termination, as evidenced by the close temporal proximity between her requests for accommodation and her termination, as well as the lack of any legitimate non-pretextual basis for the termination.

72.    As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered and continues to suffer significant damages, including lost wages, lost benefits, diminished earning capacity, and emotional distress.

73.    Defendant's conduct was intentional, willful, and in reckless disregard of Plaintiff's federally protected rights, warranting an award of punitive damages.

## COUNT FOUR
**Retaliation in Violation of the Pennsylvania Human Relations Act**

74.    Plaintiff hereby incorporates all allegations contained in the above-mentioned Paragraphs fully as if they were set forth at length.

75.    The PHRA prohibits retaliation against employees who engage in protected activity related to pregnancy and sex discrimination.

76.    As set forth above, Plaintiff engaged in protected activity by notifying Defendant of her pregnancy, taking medically necessary maternity leave, and requesting pregnancy-related accommodations in the form of a transfer to a remote position.

77.    Plaintiff suffered an adverse employment action when she was terminated on May 29, 2025, in close temporal proximity to her protected activity and requests for accommodation.

78.    As a direct and proximate result of Defendant's unlawful retaliation in violation of the PHRA, Plaintiff has suffered and continues to suffer significant damages, including lost wages, lost benefits, diminished earning capacity, and emotional distress.

## COUNT FIVE
**Failure to Accommodate in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. & & The Pregnant Workers Fairness Act (PWFA)**

79.    Plaintiff hereby incorporates all allegations contained in the above-mentioned Paragraphs fully as if they were set forth at length.

80.     The Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., as amended by the ADA Amendments Act of 2008, prohibits covered employers from discriminating against a qualified individual on the basis of disability, including the failure to provide reasonable accommodations.

81.     At all relevant times, Defendant employed 1,600 or more employees and is a covered employer within the meaning of the ADA.

82.     At all relevant times, Plaintiff was a qualified individual with a disability within the meaning of the ADA. Specifically, Plaintiff's pregnancy-related medical complications — including the need for External Cephalic Version ("ECV") procedures, her associated physical limitations, and the denial of her short-term disability claim by The Hartford — constituted physical impairments that substantially limited one or more major life activities, including but not limited to the ability to perform manual labor, travel, and engage in normal physical activities associated with her role as a Collision Estimator.

83.     Plaintiff was qualified to perform the essential functions of her position, with or without reasonable accommodation, as evidenced by her satisfactory performance record, her doctor's clearance to return to work as of May 19, 2025, and Defendant's own agreement to bring her back on June 9, 2025.

84.     Plaintiff requested reasonable accommodations on two separate occasions. On May 2, 2025, Plaintiff contacted HR representative Kayla Manross and requested a transfer to a work-from-home department within the company to accommodate her medical condition and her status as a new mother following a complicated pregnancy. That request was denied.

85.     On May 16, 2025, Plaintiff again requested a transfer to a remote work department during a phone call with Kayla Manross to discuss her return to work. That request was denied a second time.

86.     Defendant failed to engage in any good-faith interactive process with Plaintiff to explore whether her requested accommodation or any alternative accommodation could be provided without undue hardship.

87.     Defendant's denial of both accommodation requests was not accompanied by any explanation that the accommodations would constitute an undue hardship, nor did Defendant propose any alternative accommodations.

88.     Thirteen days after Plaintiff's second accommodation request was denied, Defendant terminated her employment, citing a pretextual reason of nonpayment of insurance premiums.

89.     Defendant's failure to provide reasonable accommodation and its subsequent termination of Plaintiff's employment constitutes unlawful discrimination on the basis of disability in violation of the ADA.

90.     As a direct and proximate result of Defendant's failure to accommodate, Plaintiff has suffered and continues to suffer significant damages, including lost wages, lost benefits, diminished earning capacity, and emotional distress.

91.     Defendant's conduct was intentional, willful, and in reckless disregard of Plaintiff's rights under the ADA, warranting an award of punitive damages.

### COUNT SIX
### Failure to Accommodate in Violation of the Pennsylvania Human Relations Act

92.     Plaintiff hereby incorporates all allegations contained in the above-mentioned Paragraphs fully as if they were set forth at length.

93.    The Pennsylvania Human Relations Act, 43 P.S. § 951 et seq., prohibits employers from discriminating against employees on the basis of disability and requires employers to provide reasonable accommodations to employees with disabilities unless doing so would cause undue hardship.

94.    At all relevant times, Defendant employed five or more persons and is an "employer" within the meaning of the PHRA.

95.    At all relevant times, Plaintiff was a person with a disability within the meaning of the PHRA, in that her pregnancy-related medical complications, including the need for ECV procedures and associated physical limitations, constituted physical impairments that substantially limited one or more major life activities.

96.    Plaintiff was qualified to perform the essential functions of her position with or without reasonable accommodation, as confirmed by her treating physician's clearance to return to work on May 19, 2025, and by Defendant's own agreement to have her return on June 9, 2025.

97.    As set forth above, Plaintiff requested reasonable accommodations on May 2, 2025 and again on May 16, 2025, in the form of a transfer to a work-from-home department within the company. Both requests were denied without any engagement in an interactive process or proposal of alternative accommodations.

98.    Defendant's failure to accommodate Plaintiff's disability-related needs, and its subsequent termination of her employment thirteen days after her second accommodation request, constitutes unlawful disability discrimination and failure to accommodate under the PHRA.

99.    As a direct and proximate result of Defendant's failure to accommodate in violation of the PHRA, Plaintiff has suffered and continues to suffer significant damages, including lost wages, lost benefits, diminished earning capacity, and emotional distress.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Stephanie Kear respectfully requests that this Court grant the following relief:

a) Enter judgment in favor of Plaintiff and against Defendant on all counts;

b) Award Plaintiff compensatory damages to make her whole for all lost wages, earning capacity, and benefits, past and future, that she has suffered or may suffer as a result of Defendant's unlawful conduct;

c) Award Plaintiff compensatory damages for past and future pain and suffering, emotional distress, mental anguish, and humiliation resulting from Defendant's unlawful conduct;

d) Award Plaintiff punitive damages for Defendant's intentional and reckless violations of federal law;

e) Award Plaintiff back pay and all lost compensation and benefits;

f) Award Plaintiff front pay or reinstatement as the Court deems appropriate;

g) Award Plaintiff pre-judgment and post-judgment interest;

h) Award Plaintiff her reasonable attorneys' fees and costs of suit pursuant to Title VII and the PHRA;

i) Grant such other and further relief as this Court may deem just, equitable, and proper.

## <u>JURY DEMAND</u>

Plaintiff Stephanie Kear hereby demands a trial by jury on all issues so triable in this action.

Dated: March 30, 2026

*/s/ Ethan P. Underwood, Esq.*
Ethan P. Underwood, Esq.
Andrew Lacy, Jr., Esq.
**THE LACY EMPLOYMENT**
**LAW FIRM LLC**
3675 Market Street
Philadelphia, PA 19104
(t) 412-301-3908
ethan@employment-labor-law.com
andrew.lacy@employment-labor-law.com